IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| RAINEY McKENZIE JACKSON, as Temporary Administrator of the Estate of DAQUAN KWAMANE JACKSON,<br><br>Plaintiff,<br><br>v.<br><br>GORDON COUNTY, GEORGIA; SHERIFF MITCH RALSTON, in his official capacity; DEPUTY WILLIAM S. JINRIGHT III (#140), individually; OFFICER IN CHARGE ANTHONY L. HILES (#309), individually; OFFICER IN CHARGE G.C. SOULIOS (#323), individually; JAILER G.R. MARTINEZ (#314), individually; JAILER JOSHUA W. BEAVERS (#303), individually; JAILER DYLAN P. BLACKSTOCK (#349), individually; JOHN/JANE DOES 1–5, individually;<br><br>Defendants. | Civil Action File No.:<br><br>**JURY TRIAL DEMANDED** |

1

COMPLAINT

## I. NATURE OF THE ACTION

Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 to vindicate the constitutional rights of Decedent DAQUAN KWAMANE JACKSON ("Jackson"), a 38-year-old father who died fewer than two hours after he was booked into the Gordon County Jail. This case involves an escalating, objectively obvious medical emergency—known cocaine intoxication with severe hallucinations and disorientation, inability to stand without physical assistance, repeated audible pleas for medical help and fear of death, loss of bowel control with visible fecal and urinary incontinence, progressive collapse, and ultimately respiratory arrest. Multiple Defendants repeatedly observed and acknowledged this emergency. Defendants nevertheless failed to obtain medical evaluation before jail admission, admitted Jackson despite written policies requiring refusal of admission or medical evaluation for detainees heavily intoxicated by narcotics, failed to provide required heightened in-person surveillance, and—most critically—delayed lifesaving intervention after explicitly recognizing that Jackson was not breathing. Plaintiff demands trial by jury on all issues so triable.

## II. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Gordon County, Georgia, within the Rome Division of the Northern District of Georgia.

## III. PARTIES

3. Plaintiff is the duly appointed Administrator of the Estate of Daquan Kwamane Jackson pursuant to Temporary Letters of Administration issued by the Probate Court.

4. Decedent Daquan Kwamane Jackson was 38 years old at the time of his death. He worked as a welder and is survived by his spouse and minor children.

5. Defendant Gordon County, Georgia ("Gordon County") is a municipal entity responsible for the operation, funding, staffing, policies, training, and supervision of the Gordon County Jail.

6. Defendant Sheriff Mitch Ralston is the elected Sheriff of Gordon County and the final policymaker for the operation of the Gordon County Jail. He is sued in his official capacity.

7.  Defendant Deputy William S. Jinright III (#140) was an arresting deputy. He had immediate notice from witness reports and dispatch communications that Jackson was high on cocaine and experiencing severe hallucinations and disorientation. He is sued in his individual capacity.

8.  Defendant Officer in Charge Anthony L. Hiles (#309) was on duty in booking and participated in welfare checks and response decisions, including a welfare check using a flashlight and subsequent response actions. He is sued in his individual capacity.

9.  Defendant Officer in Charge G.C. Soulios (#323) monitored booking/master-control cameras and directed or participated in welfare checks and response actions. He or she is sued in his or her individual capacity.

10. Defendant Jailer G.R. Martinez (#314) was seated at the booking desk in close proximity to Jackson's holding cell, monitored camera feeds, and participated in the breathing check and response sequence. She is sued in her individual capacity.

11. Defendant Jailer Joshua W. Beavers (#303) and Defendant Jailer Dylan P. Blackstock (#349) were on-duty jail personnel involved in intake, monitoring, and/or the response to Jackson's medical emergency. They are sued in their individual capacities.

4

12. John/Jane Does 1–5 include supervisors, booking personnel, medical staff, and other officials whose identities are presently unknown but who participated in or were responsible for the acts and omissions alleged herein. Plaintiff will amend this Complaint to reflect their true identities once they are confirmed through discovery.

## IV. FACTUAL ALLEGATIONS

### A. The Medical Emergency Begins at the Arrest Scene

13. On February 22, 2024, Jackson's spouse called 911 to report that Jackson was high on cocaine and actively hallucinating, including believing someone was in their home.

14. The 911 call and dispatch communications reflected that Jackson was hallucinating and that his behavior was not rational or oriented.

15. Jackson's spouse reported that Jackson had discharged a firearm inside the home while family members, including children, were present.

16. Responding officers, including Defendant Jinright, had actual notice from dispatch and on-scene witness reports that Jackson was high on cocaine, hallucinating, and behaving in a manner indicative of severe physiological distress.

17. Jackson's condition presented an obvious medical emergency rather than mere intoxication.

18. Upon contact and arrest, Jackson displayed profound impairment and disorientation.

19. Officers observed that Jackson was unable to maintain balance and required physical assistance to walk and to prevent falling.

20. Under these circumstances, the need for emergency medical evaluation was objectively obvious to a reasonable officer and was subjectively known to Defendant Jinright.

21. Nevertheless, Defendant Jinright and other arresting officers disregarded Jackson's serious medical need and chose not to request EMS or to transport Jackson to a hospital, and instead transported him directly to the Gordon County Jail.

**B. Booking Intake: Multiple Officers Observe Severe Impairment**

22. Upon arrival at the jail, multiple officers and jailers physically assisted Jackson from the sallyport/vehicle into booking because he could not stand upright without support.

23. Officers positioned themselves around Jackson to hold him upright, including placing hands on his arms and positioning themselves to prevent falling.

24. Officers provided Jackson a cup of water at the booking counter—an unusual act in the booking context that reflected recognition of Jackson's medical compromise.

25. Jackson cried out for medical help during booking and thereafter.

26. Jail staff knew, based on the arrest circumstances and Jackson's observed condition, that he was intoxicated by cocaine and severely impaired.

27. Gordon County Jail had written policies and procedures addressing intoxicated detainees and medical emergencies, including pre-admission procedures and emergency medical response and in-person surveillance requirements.

28. Despite Jackson's severe impairment and the written policies, jail staff admitted Jackson and placed him into holding cell 172 rather than obtaining medical evaluation.

**C. Inside the Holding Cell: Audible Pleas, Disorientation, and Loss of Bowel Control**

29. After placement in the holding cell, Jackson's condition visibly and audibly deteriorated.

30. Jackson repeatedly and loudly pleaded for help and repeatedly yelled statements including: "I don't want to die in here."

31. Jackson repeatedly and loudly stated: "I shit on myself."

32. Jackson suffered loss of bowel control and became covered in feces and urine.

33. Surveillance video depicts Jackson covered in bodily waste and repeatedly slipping in fecal matter while attempting, unsuccessfully, to stand.

34. Jackson rolled in bodily waste while struggling to stand and displayed severe confusion and disorientation.

35. Jackson's pleas and statements were loud enough to be heard and were heard in the booking area immediately outside his cell.

36. Defendant Martinez was seated at the booking desk approximately six feet from Jackson's cell door, within close proximity to Jackson, and she heard his repeated loud pleas and statements.

37. From Martinez's position, the camera monitors displayed Jackson's cell and permitted direct observation of his condition, and Martinez did observe that condition.

**D. Early Door Observation: Defendant Hiles Watches Jackson Face-Down in Bodily Waste**

38. At approximately 05:39 on the video timeline, Defendant Hiles stood and knocked at the cell door and stared at Jackson lying face-down on the floor—not on the mattress—covered in feces and urine.

39. While Hiles observed at the door, Jackson audibly pleaded: "Wait, wait, I need help," and made additional distress statements including "Oh no. Oh no. Wait."

40. Jackson rolled and attempted to orient himself but was unable to get up or sit up and appeared confused about the source of the knocking.

41. At approximately 07:00 on the video timeline and while still standing at Jackson's cell door, Defendant Hiles flushed the floor drain near Jackson's face while Jackson remained on the floor in bodily waste.

42. Defendant Hiles continued to watch through the window until approximately 07:13, then walked away and did not initiate emergency medical response.

43. The duration and nature of this observation provided Defendant Hiles with ample opportunity to recognize, and he did recognize, Jackson's medical distress, but he did not initiate emergency intervention.

**E. Apnea Recognition Captured on Video**

44. Preceding the welfare check initiated by Defendant Soulios, Jackson exhibited markedly rapid and labored respirations that were clearly audible through the jail's video and audio monitoring system. Surveillance audio captured loud, rapid breathing at an estimated rate approaching approximately 90–100 respirations per minute—far exceeding normal adult respiratory rates and consistent with severe physiological distress.

45. These respirations were sufficiently pronounced to be heard through the monitoring system utilized by Defendant Soulios in master control and were audible within the booking area where Defendants Martinez and Hiles were stationed immediately outside Jackson's holding cell. The volume, intensity, and abnormal rate of Jackson's breathing provided clear, objective indicators of escalating medical crisis and impending respiratory failure prior to the welfare check.

46. Despite these audible signs of acute distress, no emergency medical response was initiated at that time.

47. After observing via camera that Jackson appeared possibly unconscious, Defendant Soulios directed a welfare check by telephoning the booking desk at approximately 21:00 on the video timeline.

48. Defendant Soulios personally observed via the master-control camera system that Jackson appeared face-down and possibly unconscious in the holding cell. Based on this observation, Defendant Soulios initiated a welfare check by contacting booking staff via telephone call and directing Defendant Martinez to physically check Jackson.

49. Immediately upon answering that phone call, Defendant Martinez snapped her head toward the camera monitor showing Jackson's cell. Defendant Hiles also looked toward the monitor.

50. Martinez ended the phone call at approximately 21:31 of video runtime and again looked toward the monitor, and Defendant Hiles again looked toward Jackson's cell.

51. Defendant Hiles then walked at an unhurried pace toward Jackson's cell door and arrived at the cell window at approximately 21:58.

52. At approximately 21:59 on the video timeline, Defendant Hiles used a flashlight to illuminate Jackson's body through the cell window and remained at the window observing Jackson continuously until approximately 24:00.

53. In his written incident report, Defendant Hiles acknowledged that during this flashlight check he did not observe a rise in Jackson's chest, indicating an absence of visible breathing. Despite this documented observation of no chest rise during the flashlight check, Defendant Hiles did not immediately initiate CPR or summon emergency medical intervention.

54. Defendant Hiles's documented observation of no chest rise during the flashlight check constituted contemporaneous recognition of respiratory arrest or impending respiratory failure. A reasonable officer in that position would understand that absence of breathing constitutes a medical emergency requiring immediate intervention, including CPR. Defendant Hiles possessed the training, physical proximity, and authority to initiate lifesaving measures

at that moment but instead disengaged from the cell and delayed intervention.

55. During communications between Defendant Soulios and Defendant Hiles, Defendant Hiles reported that Jackson did not respond to the flashlight stimulus and appeared not to be breathing. Defendant Soulios instructed further physical checking. These communications demonstrate that supervisory personnel possessed contemporaneous knowledge that Jackson exhibited signs of respiratory arrest prior to any CPR being initiated.

56. Between 24:01 and 26:03 Defendant Hiles walked unhurriedly toward a back office, telling Defendant Martinez, as he passed, that he did not see a rise in Jackson's chest. During this more than two-minute interval, Martinez completed administrative tasks at a computer and retrieved papers from a copy machine which she carried into a back office where Hiles was already located. At that moment, Defendant Hiles subjectively understood that Jackson was not breathing and faced a substantial risk of imminent death.

57. At approximately 26:04, more than two minutes after Defendant Hiles and Defendant Martinez became aware that Jackson was not breathing, Defendant Martinez began walking toward the cell while Defendant Hiles followed behind at a slow pace. At approximately 26:11, Defendant Hiles

began donning rubber gloves while Defendant Martinez peered through the cell door window.

58. At approximately 26:21, Defendants Hiles and Martinez arrived together at the cell door. Defendant Martinez opened the door halfway and Defendant Hiles opened it further. Upon observing Jackson, Martinez stated: "I don't think he's breathing." Defendant Martinez tapped Jackson's foot with her boot while both officers called Jackson's name repeatedly.

59. At approximately 27:17, Defendant Hiles stepped into the cell, placed his hand on Jackson's neck, and, consistent with his written report, confirmed the absence of a pulse. He then verbally acknowledged again that Jackson was not breathing.

60. At the moment Defendant Hiles confirmed the absence of a pulse, Jackson's need for immediate CPR was objectively obvious. Defendants were physically present, had immediate access to Jackson, and possessed the training and authority necessary to initiate CPR without delay.

61. Despite explicitly recognizing and verbally confirming that Jackson was not breathing—a condition presenting an obvious and immediate risk of death—Defendants exited the cell area, closed the door, and delayed initiating CPR or other lifesaving measures.

62. Defendant Soulios was informed that Jackson appeared not to be breathing and that no pulse could be felt. Despite this contemporaneous recognition of respiratory arrest and cardiac compromise at multiple levels of supervision, no immediate CPR or emergency medical intervention was initiated or ordered.

63. Multiple Defendants—including supervisory personnel—possessed actual knowledge that Jackson was not breathing and had no detectable pulse. Despite this knowledge, Defendants consciously chose not to initiate or order CPR at that time, electing instead to disengage from the cell area and undertake non-emergency tasks. This was not a single mistaken judgment but a series of deliberate non-intervention decisions made despite escalating awareness of a life-threatening emergency.

64. At the time Defendants acknowledged that Jackson was not breathing and had no detectable pulse, they were physically present at the cell door, had immediate access to Jackson, and possessed the training, equipment, and authority necessary to initiate CPR without delay. No external barrier, safety threat, or logistical impediment prevented immediate lifesaving intervention. Nevertheless, Defendants consciously disengaged from the cell and delayed initiating CPR despite the obvious and urgent need for immediate action.

65.   Defendant Hiles then radioed Defendant Beavers to come to booking to provide "assistance." Defendant Beavers walked from jail reception to booking and observed Defendant Martinez standing at Jackson's closed door.

66.   When Defendant Beavers asked what was occurring, Defendant Martinez responded, "He's not breathing." Upon hearing this statement, Defendant Beavers acquired actual knowledge that Jackson faced an immediate and substantial risk of death.

67.   Despite this knowledge, Defendant Beavers did not immediately initiate CPR or other lifesaving measures. Instead, he took Defendant Martinez's place at approximately 28:42 in front of Jackson's closed cell door while Defendant Martinez donned gloves and left the immediate area.

68.   Defendant Beavers remained standing in front of Jackson's closed cell door for approximately 30 seconds peering through the window at Jackson's lifeless body, adjusting his radio, and looking at his surroundings.

69.   At approximately 29:10, Defendant Beavers leaves the closed cell door—unlocked and unattended. He jogs toward the booking desk from which he retrieves a pair of gloves.

70.   At approximately 29:23, Defendant Beavers and Defendant Martinez walk together back toward Jackson's closed cell door.

71.   Approximately twelve seconds later, Defendants Beavers and Martinez open Jackson's cell door and again look at Jackson but do not initiate CPR or render any aid.

72.   At approximately 29:37, Defendant Martinez again walks away from Jackson's cell, and Defendant Beavers again stares at Jackson for nearly 20 seconds without providing CPR or other aid despite possessing both subjective knowledge that CPR was medically necessary and the immediate physical ability to provide it.

73.   Defendants did not make a single mistaken judgment; rather, they encountered multiple escalating indicators of medical crisis—including visible distress, lack of responsiveness, absence of breathing, and absence of pulse—and at each stage consciously chose non-intervention despite having the immediate ability to provide lifesaving care.

74.   Defendant Hiles radioed Defendant Blackstock to meet him at booking. Defendant Blackstock walked to the booking area carrying documents and arrived subjectively aware that Jackson was not breathing and had no pulse.

75.   At approximately 30:15 of video runtime, Defendant Blackstock instructed Defendant Beavers to begin CPR. Only then did Defendant Beavers begin chest compressions at an excessive and accelerated rate.

**F. Delay Before CPR After Apnea Recognition**

76.   After verbally acknowledging that Jackson was not breathing, officers moved without urgency and delayed direct lifesaving intervention while Jackson remained inside the cell.

77.   CPR compressions did not begin until minutes after Defendants had recognized and communicated that Jackson was not breathing and had no pulse.

78.   Jackson never regained meaningful responsiveness, and he died shortly after EMS transport.

**G. Monitoring Failures and Policy Noncompliance**

79.   Under the written jail policies, inmates recovering from intoxicants or exhibiting mental or emotional disorder were to receive in-person surveillance at least every fifteen minutes.

80.   Despite Jackson's obvious intoxication and escalating distress, Defendants failed to provide required heightened in-person surveillance.

81.   Defendants' inaction and delayed response occurred despite repeated audible pleas for help, visible loss of bowel control, and explicit recognition of apnea.

82.   Defendants' acts and omissions were a direct and proximate cause of Jackson's death.

17

83. The events described above reflect multiple distinct decision points at which Defendants possessed actual knowledge of Jackson's serious medical need and had the opportunity to obtain medical intervention but failed to do so, including: (a) the decision to transport Jackson to jail rather than obtain emergency medical evaluation despite known cocaine intoxication and severe hallucinations; (b) the decision to admit Jackson into the jail despite severe impairment and inability to stand without assistance; (c) the failure to initiate emergency care while Jackson audibly pleaded for help and visibly deteriorated; and (d) the delay in initiating CPR after explicitly recognizing and confirming that Jackson was not breathing.

84. Timely emergency medical intervention would have materially increased Jackson's likelihood of survival. Immediate transport to an emergency department at the time of arrest, or prompt initiation of CPR and activation of EMS upon recognition of respiratory arrest, would have significantly improved his chances of resuscitation and survival. The delay in obtaining emergency medical care and the delay in initiating CPR were direct and proximate causes of Jackson's death.

## H. Monell Factual Basis

85. Gordon County, acting through the Sheriff as final policymaker for jail operations, maintained written policies governing intake screening,

admission of intoxicated detainees, emergency medical response, and required in-person surveillance intervals for inmates recovering from intoxicants or exhibiting mental or emotional distress.

86. These policies required heightened monitoring and medical evaluation for detainees heavily impaired by narcotics and directed jail personnel to obtain emergency medical care when serious medical need was apparent.

87. Notwithstanding these written directives, multiple officers across distinct operational roles—including arresting deputies, intake personnel, booking supervisors, and master-control staff—acted in a consistent and coordinated manner that departed from these safeguards by:

- admitting Jackson despite obvious severe intoxication and medical distress;

- failing to obtain emergency medical evaluation;

- failing to conduct required in-person surveillance; and

- responding without urgency even after explicitly recognizing that Jackson was not breathing.

88. The involvement of Defendant Soulios, a supervisory officer monitoring master-control cameras, demonstrates that the failure to respond was not isolated to a single officer but reflected systemic inaction despite escalating awareness across multiple levels of command. The failure to intervene after supervisory personnel recognized respiratory arrest supports an inference of

institutional custom, deficient training, or tacit approval of delayed medical response.

89. The uniformity of these actions across multiple personnel supports a plausible inference that Gordon County maintained a widespread custom, practice, or unofficial policy of conscious indifference to serious medical needs.

90. The coordinated inaction of multiple officers occupying distinct operational roles during the same event supports an inference of institutional practice rather than isolated negligence.

91. Alternatively and additionally, Gordon County failed to adequately train and supervise officers regarding:

- recognition of medical emergencies associated with stimulant intoxication;
- proper intake screening for severely impaired detainees; and
- immediate response requirements when a detainee exhibits respiratory distress or apnea.

92. The need for such training was obvious, and the predictable consequence of failing to provide it was the constitutional injury suffered by Jackson.

93. Supervisory personnel participated in and approved the conduct described herein, including delayed emergency response after explicit recognition of apnea, thereby ratifying unconstitutional practices.

94. The foregoing customs, practices, failures to train or supervise, and policymaker ratification were the moving force behind the constitutional violations and Jackson's death.

95. Upon information and belief, no officer or jail employee involved in the events described herein was meaningfully disciplined, retrained, or subjected to corrective action following Jackson's death.

96. The failure of supervisory personnel and policymakers to impose discipline or corrective measures despite the obvious nature of the constitutional violations—including delayed intervention after explicit recognition that Jackson was not breathing—constitutes ratification of the conduct and reflects deliberate indifference to the constitutional rights of detainees.

97. This post-incident ratification further evidences a widespread custom, practice, or policy tolerating noncompliance with medical safeguards for intoxicated detainees.

98. Upon information and belief, similar failures to comply with medical monitoring policies have occurred previously at the Gordon County Jail.

**V. CLAIMS FOR RELIEF**

21

## COUNT I

42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need (Arrest Phase)

(Fourth Amendment – Against Defendant Jinright in His Individual Capacity)

99.    Plaintiff incorporates by reference all preceding paragraphs.

100.    Jackson exhibited an objectively serious medical need at the scene of arrest, including known cocaine intoxication, severe hallucinations, disorientation, and inability to ambulate or stand without assistance.

101.    Defendant Jinright had actual knowledge of these facts from dispatch, witnesses, and direct observation.

102.    Defendant Jinright failed to obtain emergency medical evaluation and instead transported Jackson to jail, an objectively unreasonable response to an obvious medical emergency.

103.    Defendant Jinright acted with deliberate indifference, causing Jackson's injuries and death.

## COUNT II

42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need (Custodial Phase)

(Fourteenth Amendment – Against Defendants Hiles, Soulios, Martinez, Beavers, Blackstock, and Does in Their Individual Capacities)

104.    Plaintiff incorporates by reference all preceding paragraphs.

105. Jackson had an objectively serious medical need while in custody, including severe intoxication, inability to stand without support, disorientation, repeated pleas for help and fear of death, loss of bowel control, and respiratory failure.

106. Defendants had subjective knowledge of the risk of serious harm through close proximity, camera monitoring, direct observation, and Jackson's repeated, loud pleas for help.

107. Defendant Hiles personally observed Jackson face-down on the floor covered in bodily waste and failed to initiate medical response.

108. Defendant Martinez was seated feet from the cell and monitored the camera feed; she observed and heard Jackson's pleas and deterioration.

109. Defendants Martinez and Hiles explicitly recognized apnea, including Martinez stating, "I don't think he's breathing," and Martinez telling another officer, "He's not breathing," after Hiles confirmed "No."

110. Despite explicit recognition that Jackson was not breathing, Defendants delayed immediate lifesaving intervention, including delaying CPR for minutes after acknowledging apnea.

111. Defendants' deliberate indifference was objectively unreasonable and proximately caused Jackson's death and resulting damages.

COUNT III

23

42 U.S.C. § 1983 – Municipal Liability (Monell)

(Against Gordon County and Sheriff Ralston in His Official Capacity)

112. Plaintiff incorporates by reference all preceding paragraphs.

113. Gordon County maintained customs, practices, and/or training and supervision deficiencies that resulted in admission and inadequate monitoring of severely intoxicated detainees and non-urgent response to medical emergencies in booking/holding.

114. The coordinated failure of multiple officers to comply with written policies, combined with delayed intervention after explicit recognition of apnea, supports an inference of a widespread custom or deliberate indifference in training and supervision.

115. These customs and/or training and supervision failures were the moving force behind the constitutional violations and Jackson's death.

116. Upon information and belief, no meaningful disciplinary action, retraining, or corrective measures were taken against the officers involved following Jackson's death.

117. The failure of supervisory personnel and policymakers to impose corrective action despite the obvious nature of the constitutional violations constitutes ratification of the conduct and reflects deliberate indifference to the constitutional rights of detainees.

24

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants as follows:

A. Award compensatory damages in an amount to be determined by the jury;

B. Award punitive damages against the individual-capacity Defendants to the extent permitted by law;

C. Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

D. Award pre- and post-judgment interest as permitted by law; and

E. Grant such other and further relief as the Court deems just and proper.

## VII. JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this 22nd day of February 2026.

/s/ Kendall A. Teal
Kendall A. Teal
Georgia Bar No. 553978

KENDALL TEAL, ATTORNEY AT LAW, LLC
3142 Golf Ridge Blvd
Suite A
Douglasville, GA 30135
(404) 218-2888
kendall@attorneyteal.com
Counsel for Plaintiff

25

## **CERTIFICATION UNDER L.R. 7.1D**

Pursuant to Northern District of Georgia Local Rule 7.1D, the undersigned

counsel for Plaintiff hereby certifies that the above and foregoing document is a

computer-created document prepared in Times New Roman (14 point) font in

accordance with Local Rule 5.1B.

*/s/ Kendall A. Teal*
Kendall A. Teal
Georgia Bar No. 553978

KENDALL TEAL, ATTORNEY AT LAW, LLC
3142 Golf Ridge Blvd
Suite A
Douglasville, GA 30135
(404) 218-2888
kendall@attorneyteal.com
Counsel for Plaintiff